**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| TONDA McDANIEL, | ) | CASE NO. 3:18-cv-2071 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| ANDREW SAUL, | ) | |
| *Comm'r of Soc. Sec.*, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Tonda McDaniel ("Plaintiff"), challenges the final decision of Defendant Andrew Saul, Commissioner of Social Security ("Commissioner"), partially denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act"). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to consent of the parties. (R. 18). For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I. Procedural History

On January 12, 2007, Plaintiff filed her applications for DIB, and SSI, alleging a disability onset date of April 1, 2005. (Transcript ("Tr.") 128-130). The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 86-96). Plaintiff participated in the hearing on April 28, 2010, was represented by counsel, and testified. (Tr. 38-81). On July 14, 2010, the ALJ found Plaintiff was not disabled.

(Tr. 15-30). On July 25, 2011, the Appeals Council denied Plaintiff's request to review the ALJ's decision. (Tr. 1-5).

Plaintiff filed a previous civil action with the United States District Court for the Northern District of Ohio, resulting in a report and recommendation (R&R) that Plaintiff's case be remanded. (Tr. 1453-1463). The R&R was adopted by the District Court Judge on December 27, 2012. (Tr. 1452). Thereafter, the Appeals Council issued a remand order on March 8, 2013, consolidating Plaintiff's previous application with those subsequently filed by Plaintiff. (Tr. 1465-1467).

On October 29, 2013, a second hearing was held before an ALJ again resulting in an unfavorable decision for Plaintiff. (Tr. 1499-1520). On March 23, 2015, the Appeals Council remanded the matter for a third hearing. (Tr. 1531-1538).

On September 27, 2016, after a third hearing held on June 1, 2016, the ALJ issued a partially favorable decision. (Tr. 1297-1317). On January 26, 2018, the Appeals Council denied Plaintiff's request to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1280-1287).

On September 10, 2018, Plaintiff filed a complaint challenging the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 12, 16 & 17).

Plaintiff asserts the following assignments of error: (1) the ALJ failed to properly weigh the medical opinions of a treating source, and (2) the ALJ failed to properly evaluate Plaintiff's testimony. (R. 12).

## II. Evidence

### A.     Relevant Medical Evidence - Treatment Records[1]

On February 22, 2006, a clinical termination summary indicated Plaintiff had a current Global Assessment of Functioning ("GAF") score of 70, indicative of mild symptoms.[2] Her discharge diagnosis was depression psychosis (mild), cannabis abuse, and bereavement. (Tr. 2284, Exh. 49F at 1). On mental status examination, Plaintiff had logical thought process, exhibited cooperative behavior, full affect, a euthymic mood, with no reported delusions or hallucinations, and no reported impairment of cognition. (Tr. 2288).

On April 24, 2006, Plaintiff was taken to the St. Rita Medical Center after reports of self-harm. (Tr. 890, Exh. 25F at 97). She had a depressed mood and constricted affect. *Id*. She reported smoking one to two marijuana joints daily, and also reported being unable to afford her medications. *Id*.

On May 19, 2006, Plaintiff was seen by Subrata Roy, M.D. (Tr. 568, Exh. 7F at 27). Plaintiff reported doing fairly well with medications and denied symptoms of anxiety, mood

---

[1] The recitation of the evidence is not intended to be exhaustive of the nearly 4,000-page record. It includes only those portions of the record deemed most-relevant by the court to the assignments of error raised, and thus focuses heavily on the treatment and opinions of Subrata Roy, M.D. Further, because both assignments of error revolve around Plaintiff's mental health-related symptoms, the court foregoes any discussion of Plaintiff's physical impairments.

[2] The GAF scale reports a clinician's assessment of an individual's overall level of functioning. *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Ass'n, 4th ed. revised, 2000) ("DSM-IV"). An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning. A person who scores in this range may have a depressed mood, mild insomnia, or occasional truancy, but is generally functioning pretty well and has some meaningful interpersonal relationships. *Id*. An update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity ... and questionable psychometrics in routine practice." *See* Diagnostic and Statistical Manual of Mental Disorders (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

swings, irritability, paranoia, or hallucinations. *Id*. On mental status examination, Plaintiff was "alert and oriented, not in acute distress," cooperative, her speech was "low volume and goal directed," her mood was "all right," her affect was reactive, she denied suicidal/homicidal ideation, and her insight and judgment were limited. *Id*. She was diagnosed with major depressive disorder, recurrent. *Id*. Her medications were continued unchanged, as she was "doing well" on them. *Id*.

On December 4, 2006, Plaintiff reported to Dr. Roy that she was doing the same, and admitted symptoms of anxiety and depression. (Tr. 568, Exh. 7F at 26). On mental status examination, Plaintiff was "alert and oriented, not in acute distress," cooperative, her speech was "low volume and goal directed," her mood was "down," her affect was labile, she denied suicidal/homicidal ideation, and her insight and judgment were limited. *Id*. Her diagnosis and medications were continued unchanged, except that Trazodone was reduced due to increased sedation at night. *Id*.

On March 13, 2007, Plaintiff reported being stressed and was tearful during an exam with Dr. Roy because "her husband who she is separated from is severely ill with cancer. The patient is involved in a relationship with another gentleman who is asking her to get divorced and get married to him." (Tr. 566, Exh. 7F at 24). On mental status examination, Plaintiff was "alert and oriented, not in acute distress," cooperative, her speech was "low volume and goal directed," her mood was "alright," her affect was good, she denied suicidal/homicidal ideation, and her insight and judgment were limited. *Id*. Her diagnosis and medications were continued unchanged and she was advised to continue to see her therapist as she had a lot of emotional issues. *Id*.

On March 27, 2007, Plaintiff reported to Dr. Roy that she felt "down and depressed from time to time," was stressed regarding her husband's illness as well as over a relationship she

started with another man. (Tr. 565, Exh. 7F at 23). On mental status examination, Plaintiff was "alert and oriented, not in acute distress," cooperative, her speech was "low volume and goal directed," her "mood is 'pretty good,'" her affect was reactive, she denied suicidal/homicidal ideation, and her insight and judgment were limited. *Id.* Her diagnosis and medications were continued unchanged. *Id.*

On May 4, 2007, Plaintiff was seen by Dr. Roy and reported she was not doing well. (Tr. 564, Exh. 7F at 22). Plaintiff's mental status examination was largely unchanged, yet Dr. Roy increased Plaintiff's medications to reduce anxiety and depression. *Id.* Her diagnosis remained unchanged. *Id.*

On July 6, 2007, Plaintiff was seen by Dr. Roy and denied mood swings, irritability or paranoia. (Tr. 563, Exh. 7F at 21). On mental status examination, Plaintiff was cooperative, was in a "pretty good" mood, had a reactive affect, and her insight and judgment were fair. *Id.* Her diagnosis and medications were continued unchanged. *Id.*

On October 5, 2007, Plaintiff was seen by Dr. Roy and reported she was doing well. (Tr. 845, Exh. 25F at 52). Plaintiff denied mood swings, irritability or paranoia. *Id.* On mental status examination, Plaintiff was "alert and oriented, not in acute distress," cooperative, her speech was "low volume and goal directed," her mood was "not too bad," her affect was reactive, she denied suicidal/homicidal ideation, and her insight and judgment were limited. *Id.*

On January 7, 2008, Plaintiff was seen by Dr. Roy and reported she was doing well. (Tr. 834, Exh. 25F at 41). She denied any symptoms of "mood swings, irritability, paranoia, or hallucinations." *Id.* On mental status examination, Plaintiff was "alert and oriented, not in acute distress," cooperative, her speech was "low volume and goal directed," her mood was "not too bad," her affect was reactive, she denied suicidal/homicidal ideation, and her insight and

judgment were fair. *Id*. Her diagnosis and medications were continued unchanged. *Id*.

On March 31, 2008, Plaintiff was seen by Dr. Roy and reported she was not doing well. (Tr. 827, Exh. 25F at 34). On mental status examination, Plaintiff was "alert and oriented, not in acute distress," cooperative, her speech was "low volume and goal directed," her mood was "not too bad," her affect was reactive, she denied suicidal/homicidal ideation, and her insight and judgment were limited. *Id*. Dr. Roy added Celexa to her medications to reduce anxiety and depression, but her diagnosis remained unchanged. *Id*.

On June 23, 2008, Plaintiff was seen by Dr. Roy and reported she was "doing the same," complaining that she continued to feel anxious and depressed. (Tr. 835, Exh. 25F at 32). She had recently been diagnosed with cholelithiasis and cholecystitis. *Id*. On mental status examination, Plaintiff was "alert and oriented, not in acute distress," cooperative, her speech was "low volume and goal directed," her mood was "not too bad," her affect was reactive, she denied suicidal/homicidal ideation, and her insight and judgment were fair. *Id*. Her diagnosis and medications were continued unchanged. *Id*.

On September 22, 2008, Plaintiff was seen by Dr. Roy and reported she was "doing same," complaining of occasional anxiety and depression. (Tr. 819, Exh. 25F at 26). On mental status examination, Plaintiff was "alert and oriented, not in acute distress," cooperative, her speech was "low volume and goal directed," her mood was "pretty good," her affect was reactive, she denied suicidal/homicidal ideation, and her insight and judgment were fair. *Id*. Her diagnosis and medications were continued unchanged. *Id*.

On December 9, 2008, Plaintiff was seen by Dr. Roy "complaining of anxiety, agitation, irritability, and poor anger management." (Tr. 818, Exh. 25F at 25). Plaintiff was advised to complete anger management classes provided at the clinic, and Plaintiff agreed to do so. *Id*.

Plaintiff's mental status examination was unchanged and she continued to have a "pretty good" mood. *Id*. Her diagnosis and medications were continued unchanged. *Id*.

On March 16, 2009, Plaintiff was seen by Dr. Roy and reported she was doing better but complained of increased nightmares. (Tr. 808, Exh. 25F at 15 ). On mental status examination, Plaintiff was "alert and oriented, not in acute distress," cooperative, her speech was "low volume and goal directed," her mood was "pretty good," her affect was reactive, she denied suicidal/homicidal ideation, and her insight and judgment were limited. *Id*. Her diagnosis and medications were continued unchanged. *Id*.

On March 30, 2009, progress notes from Plaintiff's counselor indicate that Plaintiff was "appropriate in affect, appeared goal oriented, at times showed increase in euthymic mood and even laughed several times. Denies thoughts of suicide or homicide …" (Tr. 794, Exh. 25F at 14). During the session, Plaintiff was alert and oriented, focused without need for redirection, and Plaintiff "did not change the subject and was willing to actively participate in session." *Id*. Further, "no attention seeking behaviors [were] noted." *Id*.

On September 29, 2009, Plaintiff was seen by Dr. Roy and reported she was having moderate stress due to family issues. (Tr. 794, Exh. 25F at 1). She was tearful and complained of lack of sleep and appetite. *Id*. On mental status examination, Plaintiff was "alert and oriented, not in acute distress," cooperative, her speech was "low volume and goal directed," her mood was "down and depressed," her affect was labile, she denied suicidal/homicidal ideation, and her insight and judgment were limited. *Id*. Her diagnosis and medications were continued unchanged. *Id*.

On December 16, 2009, Dr. Roy completed a checklist-style form indicating that Plaintiff suffered from major depressive disorder, recurrent. (Tr. 1111-1118). He had last seen Plaintiff on

September 29, 2009. Dr. Roy indicated that Plaintiff had poor memory, appetite and sleep disturbance, recurrent panic attacks, personality change, mood disturbance, difficulty thinking or concentrating, persistent anxiety, decreased energy, and was "tearful, unable to handle life [and] situational stressors in a logical manner." (Tr. 1112). Dr. Roy indicated Plaintiff had never required hospitalization or emergency room ("ER") treatment for her symptoms. (Tr. 1113). Dr. Roy checked boxes indicating Plaintiff had "marked limitations" in all areas of understanding and memory, in seven out of eight areas of sustained concentration and persistence, in her ability to accept instructions and respond appropriately to criticism from supervisors, in her ability to get along with co-workers and peers without distracting them or exhibiting behavioral extremes, and in all areas of adaptation.[3] (Tr. 1114-1116). Dr. Roy indicated Plaintiff had made no work attempts for many years due to depression and an inability to keep up pace. (Tr. 1116). Dr. Roy indicated Plaintiff was incapable of even "low stress" work. (Tr. 1117). Dr. Roy predicted Plaintiff would be absent from work more than three times a month as a result of her impairments or treatment. (Tr. 1118). Dr. Roy asserted that "drugs and alcohol are not an issue" for Plaintiff. *Id*. Dr. Roy assessed a current GAF score of 55 and a lowest score of 50 in the past year.[4] (Tr. 1111). Dr. Roy opined that the earliest date the assessment applied to was prior to May of 2006. (Tr. 1118).

On December 22, 2009, just days after the above opinion, Plaintiff saw Dr. Roy and denied any symptoms of anxiety, mood swings, irritability, or paranoia. (Tr. 1212, Exh. 40F at 2). On

---

[3] The form defines "markedly limited" as "effectively preclud[ing] the individual from performing the activity in a meaningful manner." (Tr. 1113).

[4] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers. *See* DSM-IV at 34.

mental status examination, Plaintiff was "alert and oriented, not in acute distress," cooperative, her speech was "low volume and goal directed," her mood was "pretty good," her affect was reactive, she denied suicidal/homicidal ideation, and her insight and judgment were fair. *Id.* Her diagnosis and medications were continued unchanged. *Id.*

On March 29, 2010, Dr. Roy wrote a letter stating that Plaintiff was "totally disabled without consideration of any past or present drug and/or alcohol use." (Tr. 1215). He stated that drug and/or alcohol abuse were not a "material cause" of Plaintiff's disability. *Id.*

On June 17, 2010, Plaintiff was admitted to St. Rita's Medical Center with complaints of suicidal and homicidal ideation after she expressed being "very upset with her ex-boyfriend who has a new girlfriend." (Tr. 2291, Exh. 50F at 1). By June 20, 2010, the date of discharge, Dr. Roy observed on mental status examination that Plaintiff had a "pretty fair" mood, a reactive affect, limited insight and judgment, and no suicidal/homicidal ideation. (Tr. 2292). Her diagnosis was mood disorder, NOS and bipolar disorder mixed. (Tr. 2292). He assessed a discharge GAF score of 55, indicative of moderate symptoms.

On February 28, 2011, Plaintiff was seen by Dr. Roy and complained of increased levels of paranoia after recently spending ninety-days in jail. (Tr. 2432, Exh. 58F at 2). She also reported that her ex-boyfriend had obtained a restraining order against her, and she was tearful during the interview. *Id.* Plaintiff reported that she had run out of medication. *Id.* Plaintiff was diagnosed with major depressive disorder, recurrent and mood disorder, NOS. *Id.* Plaintiff was restarted on her medications without any alterations noted. *Id.*

On March 1, 2011, Dr. Roy assigned Plaintiff a current GAF score of 70, indicative of mild symptoms. (Tr. 2435, Exh. 58F at 5).

On June 28, 2011, Plaintiff was seen by Dr. Roy and reported doing well. (Tr. 2437, Exh.

58F at 7). She denied any "symptoms of anxiety, mood swings, irritability, paranoia or hallucinations[,]" her mood was "pretty good" and her affect was reactive. *Id*. Plaintiff was diagnosed with "Major Depressive Disorder, recurrent rule out bipolar disorder." *Id*. Her medications were continued unchanged. *Id*.

On July 13, 2011, Dr. Roy again assessed Plaintiff as having a current GAF score of 70. (Tr. 2440-2441, Exh. 58F at 10-11).

On September 8, 2011, Plaintiff was seen by Dr. Roy and she reported doing well. (Tr. 2442, Exh. 58F at 12). Her mood was "anxious, her affect was reactive, and her insight and judgment were limited. *Id*. She was diagnosed with bipolar disorder, mixed, and her medications were continued unchanged. *Id*.

On September 12, 2011, Dr. Roy again assessed Plaintiff as having a current GAF score of 70. (Tr. 2445-2446).

On December 5, 2011, Plaintiff was seen by Dr. Roy and she reported doing much better, denying symptoms of anxiety, mood swings, irritability, or paranoia. (Tr. 2557, Exh. 58F at 17). On mental status examination, her mood was anxious, her affect was guarded, and her insight and judgment were fair. *Id*. Her diagnosis and medications remained unchanged. *Id*. On the same date, she was assessed a GAF score of 70. (Tr. 2449-2450).

Less than two months later, on February 1, 2012, Dr. Roy completed a second checklist-style form indicating that Plaintiff suffered from bipolar disorder. (Tr. 2452). Dr. Roy indicated that Plaintiff engages in irrational behavior, indicating Plaintiff had drove her car at another person. (Tr. 2453). Dr. Roy listed Plaintiff's primary symptoms as mood swings, depression, anxiety, paranoid thoughts, self-isolation, risky behavior, and confrontational/aggressive behavior. (Tr. 2454). Dr. Roy checked boxes indicating Plaintiff had "marked limitations" in two

10

out of three areas of understanding and memory, in six out of eight areas of sustained concentration and persistence, in her ability to accept instructions and respond appropriately to criticism from supervisors, in her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, get along with co-workers and peers without distracting them or exhibiting behavioral extremes, and in two out of four areas of adaptation. (Tr. 2455-2457). Dr. Roy indicated Plaintiff experiences episodes of deterioration or decompensation in work-like settings because Plaintiff had no work experience and engaged in risky, antisocial behavior. (Tr. 2457). Dr. Roy indicated Plaintiff was incapable of even "low stress" work. (Tr. 2458). Dr. Roy predicted Plaintiff would be absent from work more than three times a month as a result of her impairments or treatment. (Tr. 2459). Dr. Roy assessed a current GAF score of 52 and a highest score of 60 in the past year.[5] (Tr. 2452). Dr. Roy stated that the assessment applies back to 2008. (Tr. 2459).

That same month, on February 20, 2012, Plaintiff was seen by Dr. Roy and she reported doing fairly well with her medications and denied any symptoms of anxiety, mood swings, irritability or paranoia. (Tr. 2471, Exh. 60F at 11). On mental status examination, Plaintiff's mood was "pretty good," her affect was reactive, and her insight and judgment were fair. *Id*. Her diagnosis and medications remained unchanged. *Id*. Her GAF score was assessed as 70. (Tr. 2474).

On May 14, 2012, Plaintiff was seen by Dr. Roy and was very tearful though she reported doing about the same. (Tr. 2476, Exh. 60F at 16). She reported having to pay $5000 in restitution

---

[5] Dr. Roy's statement that 60 was Plaintiff's highest score in the past year is starkly contradicted by the doctor's assessment from approximately two months earlier that assessed a GAF score of 70, indicative of mild limitations. (Tr. 2450).

and feared going to jail and losing her social benefits. *Id*. On mental status examination, Plaintiff's mood was "depressed and hopeless," her affect was labile, and her insight and judgment were limited. *Id*. On the same date, nurse Carrie Douglas noted Plaintiff had fair insight and judgment, and her mental status was "cooperative, was a little social, compliant." (Tr. 2483, Exh. 60F at 23-24).

On June 18, 2012, Dr. Roy wrote a letter indicating Plaintiff was stable and compliant on medication, also noting Plaintiff's complaints of "helplessness, hopelessness, [and] depression." (Tr. 2487, Exh. 61F at 7). He noted Plaintiff was "quick to react before thinking," and was facing possible jail time. *Id*.

On September 16, 2012, Plaintiff was seen by Warren C. Morris, M.D. (Tr. 2520-2522, Exh. 64F 11-13). Dr. Morris noted Plaintiff's insight and judgment were intact, and her mood and affect were normal. (Tr. 2521).

On February 20, 2013, Amy Homan, CNP, observed that Plaintiff's mood was normal and her affect appropriate. (Tr. 2532, Exh. 64F at 23).

On May 7, 2013, Mark Arredondo, M.D., observed that Plaintiff had some suicidal ideation but adamantly denied any intent or plan for self-harm. (Tr. 2535-2537, Exh. 64F 26-28). Plaintiff had good affect and was interactive. *Id*.

On May 11, 2013, medical expert Douglas J. Pawlarczyk, Ph. D. submitted responses to medical interrogatories. (Tr. 2499-2504). After reviewing the evidence furnished to him, Dr. Pawlarczyk indicated that the evidence established that Plaintiff suffers from major depression. (Tr. 2499). Dr. Pawlarczyk indicated that Plaintiff had mild restriction of activities of daily living, and moderate limitations in the following areas: maintaining social functioning; maintaining concentration, persistence or pace; and, repeated episodes of decompensation, each

of extended duration. (Tr. 2500). He wrote that Plaintiff can perform work tasks that do not require interaction with the public and only minimal interaction with coworkers and supervisors. *Id*. Further, Plaintiff should have no strict production quotas. (Tr. 2500). Dr. Pawlarczyk indicated that Plaintiff can follow simple to complex instructions, maintain attention and concentration, maintain socially acceptable behavior, relate satisfactorily with coworkers, adapt and respond appropriately to changes in the workplace, and exercise acceptable judgment concerning work functions and schedules. (Tr. 2502-2503). However, Plaintiff could not relate satisfactorily with the public, perform work requiring high levels of interpersonal interaction, or perform work requiring high quotas. (Tr. 2503).

On July 16, 2013, Plaintiff was seen by Dr. Roy and reported she was doing the same. (Tr. 2789, Exh. 66F at 129). On mental status examination, Plaintiff was "alert and oriented, not in acute distress," cooperative, her speech was "low volume and goal directed," her mood was "good," her affect was reactive, she denied suicidal/homicidal ideation, and her insight and judgment were limited. *Id*. Her diagnosis and medications were continued unchanged. *Id*.

On August 27, 2013, Dr. Roy wrote a letter in which he indicated that Plaintiff has had GAF scores ranging from 50-55, that her diagnosis was lifelong, and that she had been unable to sustain gainful employment for many years. (Tr. 2797). He stated that:

> Ms. McDaniel is markedly limited in her ability to remember locations and work-like procedures, understand and remember one or two step instructions, understand and remember detailed instructions, carry out simple one or two step instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance, sustain ordinary routine without supervision, work in coordination with or proximity to others without being distracted by them, complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or

13

> peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel to unfamiliar placed [sic] or use public transportation, and set realistic goals of [sic] make plans independently. Ms. McDaniel experiences episodes of deterioration and decompensation in work or work like settings, which causes her to withdraw from that situation and experience an exacerbation of signs and symptoms.

(Tr. 2797).

On November 20, 2013, Plaintiff was evaluated at the request of the state agency by Brian Griffiths, Psy. D. (Tr. 2821-2828). Dr. Griffiths concluded that although Plaintiff reported that her predominant mood is depressed, she also alluded to mood swings, agitation, irritability, angry outbursts and racing thoughts. (Tr. 2827). He concluded there was "ample evidence to support a diagnosis of Bipolar Disorder NOS." *Id*. Due to Plaintiff's description of her symptoms, Dr. Griffiths believed that there was sufficient evidence to support diagnoses of panic disorder without agoraphobia and post-traumatic stress disorder. *Id*.

On December 1, 2013, Dr. Griffiths completed a checklist-style Medical Source Statement (Mental) indicating that Plaintiff had marked limitations in her ability to understand, remember, and carry out complex instructions, but only mild limitations with respect to simply instructions. (Tr. 2829). Dr. Griffiths further opined that Plaintiff had marked limitations in social interaction. (Tr. 2830).

On May 7, 2014, Plaintiff was seen by Sujana Rayani for medication management. (Tr. 3254). Plaintiff requested Clonazepam, and reported that she continues to use marijuana and alcohol. *Id*. Dr. Rayani encouraged Plaintiff to be more compliant with medication and discussed interactions between Plaintiff's medications and marijuana and alcohol. *Id*. She was assigned a GAF score of 60. *Id*.

On October 10, 2014, Plaintiff was seen by Sheetal Dhoke, M.D., as a new patient. (Tr.

2841, Exh. 71F). She reported not being in therapy at the time. *Id*. She was diagnosed with

Bipolar disorder NOS and cannabis abuse. (Tr. 2848).

On March 23, 2015, Plaintiff reported to Jane Fletcher, LISW-S, that her bipolar symptoms

were well-managed. (Tr. 3009, Exh. 75F at 1). On mental status examination, her judgment was

within normal limits and she had "some" insight, while her affect was flat and her mood was

depressed. (Tr. 3010). She admitted to using tobacco, alcohol, and cannabis. *Id*. Plaintiff's

mental health symptoms, though chronic, were described as moderate and "tend to remain fairly

stable during the day." *Id*.

On June 29, 2015, Plaintiff stated to Dr. Dhoke that she was depressed due to her living

situation, and wanted to move out of her daughter's place but had no options. (Tr. 2898, Exh.

74F at 16). She reported crying spells, denied any side effects from her medications, and denied

any use of alcohol or drugs since March. *Id*. On mental status examination, Plaintiff had clear

speech, labile affect, logical thought process, no suicidal/homicidal ideation, and fair

insight/judgment. (Tr. 2899-2900). She was assessed a GAF score of 60. (Tr. 2901).

On October 12, 2015, Plaintiff reported to Dr. Dhoke that "[d]epression, anxiety and mood

swings are under control." (Tr. 2886, Exh. 74F at 4).

On January 4, 2016, Plaintiff was seen by nurse practitioner, Lisa Agnew, CNP, and

reported she was doing well and denied depression, anxiety, or irritability. (Tr. 3197, Exh. 79F).

Plaintiff's medications were continued unchanged and she reported no side effects. *Id*.

**B.     Relevant Hearing Testimony**

At the June 1, 2016 hearing, Plaintiff testified as follows:

- She would oversee her grandchildren coming home from school, but did not have custody of them. She resided with her children. (Tr. 1384-1385).

- She has a drivers' license, owns a vehicle, and drives three times per week. (Tr. 1386).

- She has a GED. (Tr. 1387). She had been taking some online college courses, but her children did the work for her online. (Tr. 1388).

- By approximately 2007, she had worked as a volunteer for the previous four to five years once a week for two hours. (1392-1393, *see also* Tr. 842, Exh. 25F at 49).

- She still experiences problems with depression. She feels her medications help. Her depression exists daily. She experiences crying spells and has also been diagnosed with PTSD. (Tr. 1406).

- She does not like to be around people, and has few friends. (Tr. 1407).

- She had received mental health treatment from Dr. Roy, and took her medications as prescribed. (Tr. 1408).

- She is a "very angry person." (Tr. 1408). She does not take kindly to authority. (Tr. 1409).

- She stopped smoking marijuana after her hernia surgery in approximately 2013. (Tr. 1411). She smoked for medicinal purposes. (T r. 1415).

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner determines whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity"

at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a medically determinable "severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent her from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

### IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant met the special earnings requirements of the Act on the alleged onset date, and continued to meet those requirements through September 30, 2007, but not thereafter.

2. The claimant is the unmarried widow of   the deceased insured worker. She has attained age 50. She met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act. Her prescribed period extends through August 31, 2018.

3. The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

4. Since the alleged onset date of disability, April 1, 2005, the claimant has

had the following severe impairments: obesity; degenerative disc disease of the cervical and lumbar spines; degenerative joint disease of the knees; degenerative changes of the left wrist; status-post bilateral carpal tunnel releases; heel spurs; trochanteric bursitis; vertigo; bipolar disorder; and cannabis abuse (20 CFR 404.1520(c) and 416.920(c)).

5. Since the alleged onset date of disability, April 1, 2005, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6. After careful consideration of the entire record, I find that since April 1, 2005, the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) except that the claimant can occasionally climb ladders, ropes or scaffolds but can frequently climb ramps and stairs. She can occasionally stoop or crawl but frequently kneel, crouch, and balance. The claimant can frequently handle and finger objects with the left upper extremity. The claimant can perform simple, repetitive tasks as well as some moderately complex tasks where there are infrequent changes in work processes. The work should not involve a fast assembly line pace or strict production quotas. The claimant can have no more than occasional contact with coworkers or supervisors and no direct face-to-face contact with the public.

7. Since April 1, 2005, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8. Prior to the established disability onset date, the claimant was a younger individual age 18-49. On May 25, 2016, the claimant's age category changed to an individual of advanced age (20 CFR 404.1563 and 416.963).

9. The claimant has at least a high school education and can communicate in English (20 CFR 404.1564 and 416.964).

10. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

11. Prior to May 25, 2016, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

12.     Beginning on May 25, 2016, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

13.     The claimant was not disabled prior to May 25, 2016, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

14.     The claimant was not under a disability within the meaning of the Social Security Act at any time through September 30, 2007, the date last insured (20 CFR 404.315(a) and 404.320(b)).

(Tr. 1299-1316).

## V. Law and Analysis

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id.*) However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence, but less than a preponderance, and is

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.  Plaintiff's Assignments of Error**

**1. Weight Ascribed to Dr. Roy's Opinions**

In the first assignment of error, Plaintiff takes issue with the weight the ALJ assigned to the opinions of her treating psychiatrist, Dr. Roy, as set forth in opinions completed in December of 2009, February of 2012, and August of 2013. (R. 12, PageID# 962-3872).

"Provided that they are based on sufficient medical data, 'the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.'" *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002) (quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)). In other words, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ does not give a treating source's opinion controlling weight, then the ALJ must give good reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *See Wilson*, 378 F.3d at 544 (*quoting* Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5). The "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is "in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that [her] physician has deemed [her] disabled

and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (*quoting Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)); *see also Johnson v. Comm'r of Soc. Sec.*, 193 F. Supp. 3d 836, 846 (N.D. Ohio 2016) ("The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.") (Polster, J.)

The ALJ addressed Dr. Roy's opinions in a lengthy discussion as follows:

> The claimant's primary mental health provider, Dr. Roy, opined in October 2009 that the claimant would be off work for a year (Exhibit 26F). Dr. Roy then indicated in March 2010 that the claimant was totally disabled and that drug use was not a material cause of disability (Exhibit 41F/l). I give little weight to these opinions of Dr. Roy, as they are inconsistent with the record. First, I note that a finding of disability is reserved to the Commissioner pursuant to the Regulations. Second, Dr. Roy initially completed a mental source statement in December 2009 indicating that the claimant was markedly limited in following instructions; moderately limited in ability to get along with public; and markedly limited in getting along with coworkers (Exhibit 34F). Dr. Roy then completed subsequent mental source statements in February 2012 and August 2013, where he found similar limitations to follow instructions except that Dr. Roy found only moderate limitations in following one-to-two steps. Dr. Roy further noted that the claimant would miss work three times a month (Exhibits 59F, 67F).

> Pursuant to the District Court decision, I took into consideration the December 16, 2009 opinion of Dr. Roy along with his other opinions, and conducted a more thorough analysis of the treating physician rule (Exhibit 9A). Pursuant to SSR 96-2p, a treating source's opinion may be entitled to controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the case record. In deciding whether to adopt the treating source's opinion in this situation, I considered the following factors along with any other appropriate factors: the examining relationship, the treatment relationship in terms of its frequency and duration, supportability, consistency, and specialization. Particular attention is to be given to the consistency of the opinion with other evidence, the qualifications of the source, and the degree to which the source offers supporting explanations for the opinion (Social Security Ruling 96-2p ). I note that Dr. Roy did provide the claimant with treatment for a significant period; however, length of the treatment relationship alone does not entitle an opinion to controlling weight. Here, I find that the various opinions regarding functional capacity are not entitled

to controlling weight or any degree of deference, as they are not consistent with the other evidence, including his own treatment records. As such, I give little weight to the December 2009, February 2012, and August 2013 opinions of Dr. Roy.

The record shows that the limitations are inconsistent with Dr. Roy's own clinical observations upon examination showing that the claimant appeared cooperative with a pretty good mood. I note that these observations span over multiple years and there are multiple references to the claimant's symptoms improving with medication (Exhibits 7F/22-27, 25F/l, 14-15, 25-26, 32, 34, 41, 52, 61F, 66F/129). The clinical observations of Dr. Roy include GAF scores of 70 as well, which suggests only some social limitations (Exhibits 58F/5, 7, 12). While GAF scores are just a snapshot, I note that Dr. Roy consistently assessed the same GAF score over a period. I also note that non-mental health examiners noted no apparent psychiatric issues at the time of their examinations. *See* Exhibits 49F and 64F/l l-12, 23 and 26-27. Finally, I question the reliability of these opinions, as it does not appear that the doctor considered the impact of the claimants' continuing substance use on her mental state. *See* Exhibit 7F/21-27. While social worker notes referred to cannabis use in April 2006 (at a time when the claimant reported she could not afford medications) (Exhibit 25F/97-98), at no time do his clinical reports indicate an Axial diagnosis, notwithstanding the termination summary that shows a diagnosis of cannabis abuse (*Id.* /29; also Exhibit 49F/l). *See* Exhibits 34F, 40F, 41F, 58F, 59F, 60F, 61F, and 67F. While other examiners at the mental health center made multiple references to substance abuse, Dr. Roy, save for one reference to substance abuse not being a material factor (Exhibit 41F), made no other reference; indeed his records fail to note any acknowledgement of substance use.

(Tr. 1313-1314).

The ALJ's primary reason for discounting the weight accorded to Dr. Roy's various opinions is an alleged inconsistency between the severe and debilitating limitations assessed by Dr. Roy in his three opinions compared to the relatively mild to moderate findings in the bulk of his treatment notes. If the ALJ is correct, such inconsistencies can provide a good reason for rejecting a treating source opinion.[6]

---

[6] "Inconsistencies with the treatment notes provide a good reason to not give the treating physician's opinion controlling weight." *Landuyt v. Berry Hill*, 2018 U.S. Dist. LEXIS 51239, *15 (N.D. Iowa Mar. 28, 2018); *see also Jung v. Comm'r of Soc. Sec.*, No. 1:11-CV-34, 2012 WL 346663, at *14 (S.D. Ohio Feb. 2, 2012) (finding the ALJ gave "good reasons" for

The court agrees with the Commissioner that it is abundantly clear based on the pertinent medical evidence, particularly Dr. Roy's own treatment notes, that there is a vast disconnect between the significant and marked restrictions the doctor sets forth in his opinions and the relatively mild to moderate, and often intermittent, symptomology and mental status examinations described in Dr. Roy's treatment notes. The ALJ astutely and reasonably identified these inconsistencies and reasonably proffered them as a valid basis for assigning the doctor's opinions little weight.

While Dr. Roy did provide the claimant with treatment for a significant period, the length of the treatment relationship alone did not entitle his opinions to controlling weight. The ALJ correctly noted that Plaintiff's mental status examination routinely shows her to be in a fair to good mood. Furthermore, on many occasions Plaintiff denied any symptoms of mood swings, anxiety, irritability or paranoia. Her medications also were usually continued unchanged, which gives rise to the reasonable inference that Dr. Roy believed they were effective. Further, again as expressly noted by the ALJ, Dr. Roy frequently assessed GAF scores that were indicative of mild to moderate symptoms. While Plaintiff correctly notes that GAF scores have been eliminated from the DSM, that does not detract from the fact that Dr. Roy himself perceived Plaintiff to be experiencing mostly mild to moderate symptoms. In all, the ALJ reasonably determined that the picture painted by Dr. Roy's treatment notes depicts an individual who undoubtedly had mental impairments, but whose symptoms rarely moved beyond the mild to moderate category. The ALJ's determination that Dr. Roy's opinions, assessing severely marked limitations, is

discounting a treating physician's opinions "by citing their internal and external inconsistencies and contradictions"), *report and recommendation adopted*, 2012 WL 628459 (S.D. Ohio Feb. 27, 2012).

irreconcilable with the course of Plaintiff's treatment is reasonably supported by the evidence.

Even though the medical records show isolated instances of more severe symptomology, those occasions, strewn over a lengthy period, do not cure the obvious inconsistency identified by the ALJ between the doctor's treatment records and opinions. Moreover, Plaintiff's argument essentially asks the court to override the ALJ's weighing of the medical opinions in question based on Plaintiff's own interpretation of the medical evidence in her briefs. This is tantamount to an invitation for this court to reweigh the evidence and to assign greater weight to Dr. Roy's opinions, rather than an argument that the ALJ failed to provide good reasons for rejecting them. This court's role in considering a social security appeal, however, does not include reviewing the evidence *de novo*, making credibility determinations, or reweighing the evidence. *Brainard*, 889 F.2d at 681; *see also Stief v. Comm'r of Soc. Sec.*, No. 16-11923, 2017 WL 4973225, at *11 (E.D. Mich. May 23, 2017) ("Arguments which in actuality require 're-weigh[ing] record evidence' beseech district courts to perform a forbidden ritual."), *report and recommendation adopted*, 2017 WL 3976617 (E.D. Mich. Sept. 11, 2017).

Finally, Plaintiff's reply brief suggests the ALJ was playing doctor by pointing to the mild to moderate findings in Dr. Roy's own treatment notes. (R. 17, PageID# 3916-3918). It is well-established that administrative law judges may not make medical judgments. *See Meece v. Barnhart*, 192 Fed. App'x 456, 465 (6th Cir. 2006) ("But judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.") (*quoting Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)). Although an ALJ may not substitute his or her opinions for that of a physician, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x

149, 157 (6th Cir. 2009). If fully explained with appropriate citations to the record, a good reason for discounting a treating physician's opinion is a finding that it is "unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence." *Conner v. Comm'r of Soc. Sec.*, 658 Fed. App'x 248, 253-254 (6th Cir. 2016) (*citing Morr v. Comm'r of Soc. Sec.*, 616 Fed. App'x 210, 211 (6th Cir. 2015)); *see also Keeler v. Comm'r of Soc. Sec.*, 511 Fed. App'x 472, 473 (6th Cir. 2013) (holding that an ALJ properly discounted the subjective evidence contained in a treating physician's opinion because it too heavily relied on the patient's complaints).

Because the ALJ gave good reasons for giving little weight to the opinions from Dr. Roy— the stark inconsistency between the severe and debilitating symptoms assessed in the doctor's opinions versus the mild to moderate findings found throughout his treatment history with Plaintiff—Plaintiff's contention that the ALJ improperly assessed the doctor's opinions is not well taken.

### 2. Evaluation of Plaintiff's Hearing Testimony

In the second assignment of error, Plaintiff asserts the ALJ erred in evaluating her hearing testimony. (R. 12, PageID# 3883-3886). Plaintiff's brief does not specifically identify which portions of her testimony should have been credited, but she does assert that there was "no evidence [she] engaged in any daily activities that can be compared to the mental demands of full-time work."[7] (R. 12, PageID# 3885). Thus, the court construes Plaintiff as taking issue only with the ALJ's decision to not fully credit alleged limitations stemming from her mental impairments.

---

[7] To the extent Plaintiff is suggesting that there is a presumption of credibility absent definitive proof of daily activities contradicting a claimant's self-stated mental limitations, Plaintiff cites no authority for support.

An ALJ is not required to accept a claimant's subjective complaints. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *accord Sorrell v. Comm'r of Soc. Sec.*, 656 Fed. App'x 162, 173 (6th Cir. 2016). "[C]redibility determinations with respect to subjective complaints of pain rest with the ALJ." *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987) ("[T]olerance of pain is a highly individual matter and a determination of disability based on pain by necessity depends largely on the credibility of the claimant," and an ALJ's credibility finding "should not lightly be discarded.") (citations omitted). Nevertheless, while an ALJ's credibility determinations concerning a claimant's subjective complaints are left to his or her sound discretion, those determinations must be reasonable and supported by evidence in the case record. *See, e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 310, 312 (6th Cir. 1983) ("the ALJ must cite *some* other evidence for denying a claim for pain in addition to personal observation").

"In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'" Social Security Ruling ("SSR") 16-3p, 2017 WL 5180304 at *10 (Oct. 25, 2017). Rather, an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10. A reviewing court should not disturb an ALJ's credibility determination "absent [a] compelling reason," *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), and "in practice ALJ credibility findings have become essentially 'unchallengeable.'"

*Hernandez v. Comm'r of Soc. Sec.*, 644 Fed. App'x 468, 476 (6th Cir. 2016) (*citing Payne v. Comm'r of Soc. Sec.*, 402 Fed. App'x 109, 113 (6th Cir. 2010)).

According to SSR 16-3p (as well as SSR 96-7p which it superseded), evaluating an individual's alleged symptoms entails a two-step process that involves first deciding whether a claimant has an "underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain."[8] 2017 WL 5180304 at *2-3. The ALJ's decision found the first step was satisfied and states that Plaintiff's medically determinable impairments "could reasonably be expected to cause some of the alleged symptoms." (Tr. 1309).

After step one is satisfied, an ALJ—when considering the intensity, persistence, and limiting effects of an individual's symptoms—should consider the following seven factors: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate     the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment an individual uses or has used

---

[8] "The Sixth Circuit characterized SSR 16-3p … as merely eliminating 'the use of the word credibility . . . to clarify that the subjective symptoms evaluation is not an examination of an individual's character.'" *Butler v. Comm'r of Soc. Sec.*, No. 5:16cv2998, 2018 WL 1377856, at *12 (N.D. Ohio, Mar. 19, 2018) (Knepp, M.J.) (*quoting Dooley v. Comm'r of Soc. Sec.*, 656 Fed. App'x 113, 119 n.1 (6th Cir. 2016)). Like several other courts, this court finds little substantive change between the two social security rulings, and the changes largely reflect a preference for a different terminology. *See, e.g., Howard v. Berryhill*, No. 3:16-CV-318-BN, 2017 WL 551666, at *7 (N.D. Tex. Feb. 10, 2017) ("having reviewed the old and new rulings, it is evident that the change brought about by SSR 16-3p was mostly semantic."). While the court applies the current SSR, it declines to engage in verbal gymnastics to avoid the term credibility where usage of that term is most logical.

to relieve pain or other symptoms; and, (7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p at *4-8 (same factors as in SSR 96-7p). The ALJ concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were "not fully supported for the reasons explained in [the] decision." (Tr. 1309).

The ALJ's extensive credibility analysis concerning Plaintiff's mental symptomology is as follows:

> As for activities of daily living, the claimant stated in the Function Reports that she did not do any of the chores or cooking (Exhibits 7E, 20E). Yet, the claimant indicated at the November 2013 consultative psychological examination that she could handle the light chores (Exhibit 69F).… The claimant stated as well that she oversees her 13 grandchildren at times, including getting them from school (Hearing Testimony). There is mention of the claimant doing volunteer work as well for five years as well as attending college classes for which she noted that she did well (Exhibit 66F). As for work history, the claimant alleges an onset date of April 1, 2005 but she had only minimal earnings in 2003 and no earnings in 2004, which are before her onset date. The claimant also had no earnings in 2001, which is again before her alleged onset date (Exhibit B7D).
>
> ***
>
> As for the claimant's mental impairments, she testified that she has trouble dealing with authority and does not like being around others (Hearing Testimony). I note that the claimant had no shows when she sought care with Dr. Roy (Exhibits 25F/6, 8, 13, 36, 43, 47, 90-91, 49F/l). The claimant further noted that she did fairly well while on medication. Her treating providers found that she had normal examinations, including good moods and intact concentration despite complaining of feeling depressed and anxious at times (Exhibits 7F/25-27, 25F/14-1541, 52, 72, 40F, 41F, 55F/38, 58F/7, 12, 17, 60F/11, 74F/4-10, 75F/l-4, 79F/14-18). The claimant's providers for her physical impairments also indicated that she had normal psychological examinations with appropriate mood, insight, and affect (Exhibit 75F/5-10, 15-20, 55F). I note that the record as a whole does not completely support her allegations, as evidenced by her missed appointments and inconsistent statements at times (Exhibits 25F/6, 8, 13, 36, 43, 47, 90-91, 49F/l, 64F/65). I note as well that the claimant indicated to the counselor that her goal was to get disability (Exhibit 25F/76).
>
> The medical evidence documents the existence of an impairment or impairments

that could reasonably be expected to produce a certain degree of pain or other symptoms. The pivotal question is not whether such symptoms exist, but whether those symptoms occur with such frequency, duration or severity as to reduce the claimant's residual functional capacity, as set forth above, or to preclude all work activity on a continuing and regular basis.

***

Regarding the severity of her mental status, I note that clinical examinations have consistently identified signs and symptoms consistent with an affective disorder. However, the actual clinical notes do not describe significant problems on mental status examination. Repeated examinations have noted no abnormality in thought processes or mental content. Even Dr. Roy's reports indicate that her condition has been stable, as based on a review of his clinical notes that show no significant change on examination. See especially Exhibit 25F for the period of October 5, 2007 through December 19, 2008.

The claimant's allegations of disability are not supported and are inconsistent with her overall course of treatment. While she has sought mental health care for a number of years, the record shows a history of non-compliance with prescribed treatment, including frequent no-shows for appointments. *See* Exhibit 25F/36, 43, 47, 50, 90, 91, and 92 and Exhibit 71F. *See also* Exhibit 51F. Moreover, she has not always maintained compliance with her use of medications. *See* Exhibits 75F/15 and 74F/70.

***

The record also shows that the claimant has misrepresented important aspects of her history, including her use of substances (Exhibits 7F, 48F/72, 8F/64, 27F, 33F, 57F, and 64F/65 [alcohol]), her use of tobacco (Exhibits 27F and 74F), her work history (Exhibit 59F) and her personal history (*Id.*). Even examining mental health counselors (LISW) have noted multiple inconsistencies in her presentations (Exhibit 64F/65. Compare with p. 61), while Dr. Cox's examination report is replete with inconsistent statements (Exhibit 69F). For example, there the claimant reported a ninth-grade education when she in fact has a GED. She significantly minimized the extent of her substance use, denying all alcohol and only occasional marijuana (compare with Exhibits 64F/52 and 74F/16-20 where she denied all substance use March 2015, and Exhibit 74F/38-43, where she reported regular marijuana use).

Considering the criteria enumerated in the regulations for evaluating the claimant's subjective complaints, I conclude that her testimony is not credible.

(Tr. 1309-1311).

The ALJ's analysis is hardly limited to the boilerplate language cited by Plaintiff. Here, the ALJ reasonably considered several of the factors. With respect to Plaintiff's medications, the ALJ observed that Plaintiff did fairly well while on medications, and also noted her history of non-compliance and skipping appointments. (Tr. 1309-1310). The ALJ discussed Plaintiff's daily activities and her ability to perform light chores, watching her grandchildren, performing volunteer work, and attending online college courses. (Tr. 1309). Regarding the intensity of Plaintiff's mental health symptoms, the ALJ reasonably noted the treatment records were replete with references to Plaintiff's mild to moderate symptomology and fair to good moods, as discussed above. (Tr. 1310). Plaintiff takes issue with the ALJ observing that Plaintiff made inconsistent statements, arguing that such an assertion is tantamount to a statement that an individual has poor character and is, therefore, impermissible. (R. 12, PageID# 3886). The court disagrees that taking note of inconsistent statements made by a claimant concerning her alleged symptomology is impermissible under SSR 16-3p, as such an observation does not go to a person's character, but rather to the consistency of the claimant's statements with her statements throughout the record as well as the consistency of her statements with the objective evidence of record.[9]

The ALJ engaged in a thorough analysis, and was not required to analyze all seven factors,

---

[9] Although SSR 16-3p cautions that "inconsistencies in an individual's statements made at varying times does not necessarily mean they are inaccurate," it also does not preclude such a finding. 2016 SSR LEXIS 4, *22. Moreover, the ALJ noted inconsistencies between Plaintiff's alleged symptoms and the treatment record. "[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." 2016 SSR LEXIS 4, *23.

but only those factors germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.,* *373 F. Supp.2d 724, 733 (N.D. Ohio 2005)* (Baughman, M.J.) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence"); *Masch v. Barnhart,* *406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005)* (finding that neither SSR 96-7p nor the regulations "require the ALJ to analyze and elaborate on each of the seven factors when making a credibility determination"); *Wolfe v. Colvin,* *No. 4:15-CV-01819, 2016 WL 2736179, at *10 (N.D. Ohio May 11, 2016)* (Vecchiarelli, M.J.); *Allen v. Astrue,* *No. 5:11CV1095, 2012 WL 1142480, at *9 (N.D. Ohio Apr. 4, 2012)* (White, M.J.). SSR 16-3p itself states that where "there is no information in the evidence of record regarding one of the factors, we will not discuss that specific factor," but rather will only "discuss the factors pertinent to the evidence of record." *Id. at *8*.

Given the high level of deference owed to an ALJ's findings with respect to the evaluation of a claimant's alleged symptoms and resulting limitations, under the circumstances presented herein, the court cannot find the ALJ's credibility analysis was deficient. Therefore, Plaintiff's second assignment of error is without merit.

### VI. Conclusion

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

IT IS SO ORDERED.

s/ *David A. Ruiz*
David A. Ruiz
United States Magistrate Judge

Date: January 30, 2020